Appellate Department, Superior Court, San Diego

[Civ. No. 108207.   June 12, 1942.]

CALIFORNIA EMPLOYMENT COMMISSION, Appellant,
v. H. P. BOWDEN et al., Respondents.

Earl Warren, Attorney General, John J. Dailey, Deputy Attorney General, Maurice P. McCaffrey and Samuel L. Gold for Appellant.

Von Seggern & Hawkes for Respondents.

James B. Abbey, as Amicus Curiae, on behalf of Respondents.

THE COURT—The Unemployment Insurance Act (Deering Gen. Laws, Act 8780d) originally enacted in 1935 and extensively amended in 1939, provides a general scheme "For compulsory setting aside of funds to be used for a system of unemployment insurance, providing benefits for persons unemployed through no fault of their own, and to reduce involuntary unemployment and the suffering caused thereby to a minimum."

It is stated in section 2 that:

"The imposition of the tax herein imposed upon California industry alone, without a corresponding tax being imposed on all industry in the United States would, by the corresponding penalty upon California industry, defeat the very purposes of this act set forth in section 1. Therefore, this act shall take effect only if and when there is enacted legislation by the United States Government providing for a tax upon the payment of wages by employers in this State against which all or any part of the contributions required by this act may be credited." This section also provides that: .

"Whenever such legislation enacted by the United States Government is repealed, amended, affected or otherwise changed in such manner that no portion of the contributions required by this act may be thus credited, then upon the date of such change, the provisions of this act requiring contributions and providing for payment of benefits shall cease to be operative and any assets in the unemployment fund or unemployment administration fund shall in the discretion of the State Treasurer be held in the then existing depositories or otherwise in the State Treasury. In the case of the unemployment administration fund, such moneys may thereafter be dealt with by the State Treasurer pursuant to the conditions of the grant thereof to the State by the United States Government or agency thereof."

The administration of the act is by its terms committed to a body created by it known as the California Employment Commission.

Section 6.5 of the act provides that:

" 'Employment,' subject to the other provisions of this act, means service . . . performed for wages or under any contract of hire, written or oral, express or implied."

It is, however, provided in section 7 (Sub. "a") that the term "employment" does not include "agricultural labor."

The act establishes in the state treasury an "unemployment fund" designed to furnish the means necessary to pay benefits to persons coming under its provisions suffering involuntary unemployment, and requires contributions from both employers and employees, the latter to be deducted by the employers from their wages (section 40) for the maintenance of the fund.

Sections 45 and 45.1 of the act are as follows:

Section 45. "Default of employer: Liability for interest: Action for collection. If an employer fails to make any payment required of him, or fails to pay to the commission the contributions of his workers, in accordance with the provisions of this act and of the rules and regulations adopted by the commission, he shall become additionally liable for interest on such payments at the rate of 1 per cent per month or fraction thereof from and after the date of delinquency until paid. Such employer and worker contributions, interest and the penalties hereinafter provided for shall be collectible by civil action in the name of and by the commission against the defaulting employer, in addition to any other procedures prescribed by this act."

Section 45.1. "Actions by and against commission: Preference on calendar: Evidentiary effect of certificate. In any civil action brought by or against the commission, all of the courts of this State shall give preference to such action on their calendar over all civil litigation except equity cases, cases involving extraordinary writs, or summary proceedings. In any such action a certificate attested to by the commission or its duly authorized agent showing the delinquency shall be prima facie evidence of the payment by the employing unit of the amount of wages for employment by employers set forth therein; of the levy of the contributions; of the delinquency; and of the compliance by the commission with all

the provisions of this act in relation to the computation and levy of the contributions specified in such certificate.''

The California Employment Commission, undertaking to act under section 90 of the act has adopted a rule numbered 7.1 as follows:

"Rule 7.1. Agricultural Labor Defined.—The term 'Agricultural Labor' includes all services performed:

"(1) By any employee on a farm, in connection with the cultivation of the soil, the raising and harvesting of crops; the raising, feeding, management of livestock, poultry and bees; which includes, among others, the spraying, pruning, fumigating, fertilizing, irrigating and heating which may be necessary and incident thereto;

"(2) By an employee in connection with the drying, packaging, transporting and marketing of materials which are produced on the farm or articles produced from such materials, providing such drying, processing, packing, packaging, transporting or marketing is carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations.

"The services hereinabove set forth do not constitute agricultural labor unless they are performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced. Such services, however, do not constitute agricultural labor if they are carried on as an incident to manufacturing or commercial operations.

"As used herein the term 'farm' includes, among others, stock, dairy, poultry, fruit and truck farms, plantations, ranches, ranges, orchards and vineyards.

"Forestry and lumbering are not included within the exemption òf agricultural labor.''

Section 90, when this rule was adopted, so far as applicable, read:

"Duties and powers of commission. The commission, in addition to all other duties imposed and powers granted or implied by the provisions of this act:

"(a) Shall adopt and enforce rules and regulations which to it seem necessary and suitable to carry out the provisions of this act.

"(b) Shall make such rules and standards on or before December 1, 1935, and thereafter as needed.''

It has since been amended so that subdivision (b) reads as follows:

"Shall adopt, amend or rescind regulations for the administration of this act, which shall become effective in the manner and at the time prescribed by the commission. Rules or regulations heretofore adopted shall continue in effect until amended or rescinded in accordance with the procedure prescribed by this section."

The present action was instituted by a complaint filed by the commission in the municipal court wherein it is alleged that the defendants were, at the time involved, employers within the meaning of the act, that as such they made payment of certain wages in the years 1938, 1939 and 1940, on account of which contributions were assessed against them aggregating $308.96 which have become delinquent and resulted in penalties aggregating $6.22, for which sum less a $10 credit, judgment is sought, together with interest at one per cent per month on the delinquent amounts from the dates of the respective delinquencies as set out in a schedule attached to the complaint.

The answer denies generally that any such contributions ever became due or delinquent and claims in addition that sundry of the items involved are barred by certain specified provisions of the statutes of limitations.

There appears to be no dispute about the amount of wages paid nor the contributions that have become due and delinquent if payable at all, nor the amount of interest and penalties accrued, if any have accrued at all.

The gist of the controversy turns on the question whether the defendants' employees have been engaged in agricultural labor within the meaning of the exemptions of that type of labor from the provisions of the act.

According to the testimony of one of the defendants:

"We operate a citrus grove and also rent agricultural equipment to other growers and ranchers who don't wish to invest in expensive equipment for smaller ranches. We also furnish operators and laborers to these same growers. These men are sometimes under the direction of the grower, sometimes supervised by me. I personally act as foreman or manager on some groves for which services I'm paid a fee."

He also testified that the defendants do discing, plowing and other farm work in the production of crops. Their work is principally tilling the soil, pruning and irrigating in citrus

groves and spraying for the control of insect pests. All their work has to do directly with the production of crops.

They do not fumigate. One of the partners has a small laboratory of his own at his home but the employees of the firm do not work there except in rare instances when his son or brother (the other partner) helps him in "field work." The average ranch hand cannot do this sort of thing. Their employees do not pick or pack fruit or engage in trucking or handling the crop. They sometimes pick and haul their own fruit, but do not operate their truck for others nor have any "for hire" permit. Their employees do no processing or marketing of crops. The packing house handles the processing and marketing of the fruit. The partners are engaged in land development, orchard maintenance, agricultural contracting, orchard management, soil analysis or soil surveys, appraisals and moisture control but such services are of an advisory or technical nature and performed by one of the partners only and no employees are involved. Defendants' employees do not handle any of such services or matters. In 1938 the partnership performed no work on its own land but in 1939 twenty-five per cent of the work was performed on its own land and seventy-five per cent on the lands of others; the partners owned in 1939, twenty-four acres of which about twenty-two were in orchard. A considerable part of the work was done by two minor sons of one of the partners.

It was the view of the trial court that the expression "agricultural labor," which is excepted from the term "employment" in section 7 of the act is broad enough to include all of the services performed by the employees of the defendants, and that all of the services performed by such employees were "agricultural labor," and thus, the wages paid to such employees were excepted from the terms of the act, whether the services were performed upon a ranch or farm owned or operated by the defendants, or upon some other ranch owned or operated by third parties.

It was also the view of the trial court that the third unnumbered paragraph of the above quoted rule 7.1 does not apply to paragraph 1 of said rule but only to the kinds of services described in paragraph 2 thereof, but that if such unnumbered third paragraph of the rule were intended to apply to the class of services described in paragraph 1 of the

rule, then the rule itself would amount to unauthorized legislation by the commission, in that it would purport to restrict the meaning of the expression "agricultural labor" as used by the Legislature in the act itself, and would be to that extent beyond the powers of the commission and void.

With all of these conclusions we are in accord.

As is said in the brief of the amicus curiae, "the problem presented in this action is one of definition," and the main question is what is meant by "agricultural labor." By "agricultural" according to Webster's New International Dictionary is meant:

"Of or pertaining to agriculture; connected with, or engaged in, tillage; as the *agricultural* class; *agricultural* implements.

Agriculture is there defined as follows:

"Art or science of cultivating the ground, including harvesting of crops and rearing and management of live stock; husbandry; farming; in a broader sense, the science and art of the production of plants and animals useful to man, including to a variable extent the preparation of these products for man's use. In this broader sense it includes farming, horticulture and forestry, together with such subjects as butter and cheese making, sugar making, etc."

It is urged in behalf of the commission; "that the business of respondents does not constitute agriculture but instead is of a commercial or industrial nature." Our attention is directed to the obvious fact that the act is intended to operate in connection with the Federal Social Security Act (Pub. Law No. 271, 74th Cong., 1935) and that the exemption of agricultural labor parallels a similar exemption in the Federal Social Security Act, and it is suggested that the report of the Senate committee on finance recommended the exemption on the ground, chiefly of administrative convenience, in that farm labor tends to be transient and migratory, that farms are widely scattered, farmers generally do not keep accurate books, and that their employees are often paid in part in board and lodging so that their wages are not easily ascertainable, and that for all these reasons the enforcement of this type of legislation if applied to ordinary farm labor would be productive of administrative difficulty; but that none of these difficulties in administration have any application to the operations of independent contractors who per-

form services for various farmers and get their remuneration not from the sale of crops but from a stated compensation for services furnished, and our attention is called to the expression in *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 513 [57 S. Ct. 868, 81 L. Ed. 1245, 109 A. L. R. 1327] to the effect that:

"Administrative considerations may explain several exemptions. Relatively great expense and inconvenience of collection may justify the exemption from taxation of domestic employers, farmers, and family businesses not likely to maintain adequate employment records, which are an important aid in collection and verification of the tax."

Though it be conceded, however, that administrative difficulties may have influenced the Legislature in exempting agricultural labor from the provisions of the act, it does not follow that where, as here, such an exemption has been made in general terms, it may by courts or commissions be restricted in its operation to only those classes of labor on farms and ranches which, if subjected to the provisions of the act, would be seriously involved in such difficulties. To do this would be to confine the expression "agricultural labor" within limits unwarranted by the words themselves. This may not be done. There is nothing in the evidence tending to characterize labor here involved as other than "agricultural" within the meaning of that word as illustrated by the above quoted definitions. The case of *Helmuth* v. *Industrial Acc. Com.*, 59 Cal. App. 160 [210 Pac. 428], is not in point. There an employee was engaged in blasting holes to break up hardpan on land intended to be subsequently used for planting vines and trees. An award by the Industrial Accident Commission of compensation for injuries sustained by him in such blasting was upheld. The court said:

"His work was only incidentally, in this instance, connected with the farm. Blasting of holes might as well be done for the planting of telegraph poles, or in mining or building operations and in many other connections. It is not, inherently, farm work. . . ."

Contrariwise, in the case at bar the work done *is* inherently farm work and if it is to be excluded from the exemption such exclusion would be based, not on the inherent character of the work, but only on the method of employment.

In *United States* v. *Turner Turpentine Co.*, 111 F. (2d)

400, there was considered the 1939 amendment of the Federal Social Security Act expressly specifying what the term "agricultural labor" as used therein should include, and containing very elaborate definitions.

The court said of these definitions (pp. 404, 405):

"As to the 1939 amendment of the Social Security Act, we agree with appellees that it is to be regarded as interpretative and explanatory of the term as it was used in the original act, and that it is itself a binding and final congressional declaration of what was meant by the term 'agricultural labor' there used. It is now a settled principle of statutory construction that Congress or a legislature in legislating with regard to an industry or activity, must be regarded as having had in mind the actual conditions to which the act will apply, that is, the needs and usages of such activity. When then, Congress in passing an act like the Social Security Act, uses, in laying down a . . . term of as general import as 'agricultural labor', it must be considered that it used the term in a sense and intended it to have a meaning wide enough and broad enough to cover and embrace agricultural labor of any and every kind, as that term is understood in the various sections of the United States where the act operates."

In *Wayland* v. *Kleck*, 53 Ariz. 432 [112 P. (2d) 207], it was held that one engaged in clearing and preparing land for planting, digging ditches, and fashioning dams, using farm machinery which employees repaired, and trucks to transport oil and repair parts, though he did his work for various farmers throughout his county and the state, was, with his employees engaged in "agricultural labor" rather than "commercial" or "manufacturing" activities and hence was not liable for contributions to the Unemployment Compensation Fund. The court *inter alia* commented upon *United States* v. *Turner Turpentine Co.*, *supra*, quoting the language which we have quoted and further said:

"What plaintiff's employees were engaged in was largely the clearing and preparation of land for the planting of crops, getting the land in shape or condition, and the planting or sowing of the seed; the digging of ditches and fashioning of earth dams to impound water for watering stock. To do these things the employees operated farm machinery and implements and when these got out of repair they repaired them on the farm or in a shop maintained for that purpose.

They used trucks to transport fuel oil, lubricants and repair parts. The plaintiff has a central office and kept books of account on his employees and their occupations. The evidence shows that the plaintiff at times used as many as ten or a dozen tractors in preparing the land and planting the seed, but, whether he used tractors or plows drawn by horses, it was agricultural labor. About the only thing plaintiff did not common among farmers was in the keeping of books of account, and we cannot see wherein that fact changed the character of the labor. What he was doing was not commercial, for he sold nothing. It was not manufacturing, for he made no article out of the raw materials taken or grown on the farm.''

In *Chester C. Fosgate Co.* v. *United States,* 125 F. (2d) 775, there were involved services rendered by a company in cultivating crops of citrus fruit under contract with land owners, and the services were held under the Federal Social Security Act to be ''agricultural labor,'' rendered in connection with the cultivation of the soil, even though land owners did not directly hire laborers but dealt with the company, which in turn, put laborers to work and the company was held to be entitled to recover back social security taxes with references paid to these laborers.

This decision was not, however, based on the 1939 amendment to the Federal Social Security Act, the wages involved having apparently been, in part at least, paid before that amendment was enacted. As concerned the effect of that amendment, indeed, the Court limited the effect of its prior decision in *United States* v. *Turner Turpentine Co.,* 5 Cir., 111 F. (2d) 400, saying (p. 777):

''The Company asserts that the amendment of the Social Security Act of Aug. 10, 1939, states the meaning of 'agricultural labor' which should here be applied, it being a mere clarification of the original act, citing *United States* v. *Turner Turpentine Co.,* 5 Cir., 111 F. (2d) 400. We think otherwise. The cited case involved only the question whether labor in producing turpentine gum from pine trees was in 1937 agricultural labor. It was held so to be, much weight being given to the general understanding in the States in which such work was carried on. The amendment of 1939 was said to be interpretative and explanatory of the original act, but the statement must be limited to the matter before the court. A careful examination of the legislation and its history leads us to

say that so far as it relates to the present case it was expressly intended to change existing law from a date fixed in the future, and was not declaratory of the old law and operative retroactively.''

The original act, however, excepted agricultural labor from its provisions and it appears, that prior to the enactment of the 1939 amendment the Commissioner of Internal Revenue, Treasury Department, pursuant to authority in the original act to make administrative regulations, promulgated a set of rules which included as article 206 the following:

''The term 'agricultural labor' includes all services performed—

''(a) By an employee on a farm in connection with the cultivation of the soil, the harvesting of crops, or the raising, feeding or management of live stock, bees and poultry; or

''(b) By an employee in connection with the processing of articles from materials which were produced on a farm; also the packing, packaging, transportation or marketing of those materials or articles. Such services do not constitute 'agricultural labor', however, unless they are performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced, and unless such packaging, transportation or marketing is carried on as an incident to ordinary farming operations as distinguished from manufacturing or commercial operations.

''As used herein the term 'farm' embraces the farm in the ordinary accepted sense and includes stock, dairy, poultry, fruit, and truck farms, plantations, ranches, ranges and orchards.

''Forestry and lumbering are not included within the exceptions.''

In deciding the case before it, the Circuit Court of Appeals, in *Fosgate Co.* v. *United States,* independently of the amendment of 1939 to the act and basing its ruling under the original act as interpreted in subdivision ''a'' of said article 206 of the said regulations went on to say (p. 778):

''We approve the District Court's conclusions that the services which Fosgate Company rendered in cultivating crops of fruit for others were rendered on a farm in connection with the cultivation of the soil, and were under article 206 (a) agricultural labor, although the owner of the crops did not directly hire the laborers, but dealt with the company, which in turn put the laborers to work. The labor was

done in cultivating the soil, the literal etymological meaning of agriculture. The company was entitled to recover back the taxes with reference to these wages."

In *McAllister* v. *Cobb*, 237 App. Div. 674 [263 N. Y. Supp. 349], in a proceeding under the Workmen's Compensation Law which excluded "farm laborers" from its provisions, an award in favor of a farm hand injured while cranking a tractor furnishing power for a buzz saw used to saw wood for his employer's neighbor was held to be unauthorized. It was intended by both the injured person's employer and the neighbor, that when the sawing was done it should be paid for in return work or in money; and it was in fact paid for in part by each of these. The court said that it was "constrained to hold that at the time of the accident the employer was not engaged in the business of wood sawing but in that of a farmer, and that the claimant was a farm laborer. . . ."

Various cases from outside this state have been cited in appellant's behalf in the effort to show that the services performed by respondents were not merely incidental to farm labor. Some of these seem to us to be distinguishable in their facts from the case at bar. With others, we are not in agreement.

Coming now to the case at bar we agree with appellant that the very fact that the California Unemployment Insurance Act parallels the similar provisions of the Federal Social Security Act of 1935 argues that it should have a similar construction. But the latest construction given that act by a federal court, as appears from the Fosgate case, makes it plain that to give the California act a similar construction is to include the defendants' operations in the expression "agricultural labor."

It is claimed, however, that a different situation is created by reason of rule 7.1 of the California Unemployment Commission above quoted. In this connection we are struck by the similarity of that rule to the said article 206 of the federal regulations. It will be observed that a limitation similar to that involved in the (unnumbered) third paragraph of the California rule is contained in the second sentence of subdivision "b" of article 206 of the federal regulations. It is clear that in the latter case it is not intended to qualify the definition of agricultural labor contained in subdivision "a" of that section and it is the necessary conclusion from the Fosgate case that it does not qualify that definition. Since

the California rule was patently based on this federal regulation, it is our opinion that the limitation in its said third "unnumbered" paragraph must be construed as applicable only to the situations described in its second paragraph which immediately precedes the limitation and not to the definition contained in its first paragraph, which is the analogue of subdivision "a" of paragraph 206 of the federal regulations.

What we have said is in itself decisive of this case, but we may add that we cannot accept the proposition that the authority contained in section 90 of the state act for rule making by the commission can go so far as to authorize any rule limiting an exemption expressly made by the terms of the act. We agree that such a limitation would amount to legislation and transcend the commission's authority. The regulations promulgated by the Commissioner of Internal Revenue under authority of the Act of Congress are obviously in line with the intent of the act. It would be otherwise with rule 7.1 of the California Employment Commission if it were so construed as to limit the expression "agricultural labor" in the manner in which appellant claims to have limited it. We do not think such authorities as e. g. *Butte, A. & P. Railway Co.* v. *United States,* 290 U. S. 127 [54 S. Ct. 108, 78 L. Ed. 222], militate against this view. There the Interstate Commerce Commission, pursuant to congressional authority, allowed a claim of the complainant railway for a deficit incurred while under federal control during the first World War. Subsequently the government sought to recover money paid under this award on the theory that the commission had too liberally interpreted the word "deficit." The Supreme Court of the United States held the government bound by the commission's action saying that "the Commission would necessarily act in quasi judicial capacity. If it misconstrued the term 'deficit' it committed an error, but it did not transcend its jurisdiction," and since Congress had provided no method of review, neither the commission nor a court had power to correct the error after payment had been made pursuant to the award. The difference between this situation and that involved in the making of rules by the California Employment Commission is obvious. In the absence of constitutional provision therefor it is now settled that administrative bodies in this state having state-wide functions are devoid of judicial powers. The commission's rules are valid in so far as they are in line with the

terms of the act and no farther. They are impotent to change the clear meaning of such terms.

Undoubtedly where a legislative act invests a board or other administrative agency with authority to make rules in aid of the enforcement of the act, and its enforcement involves the definition of some term used in the act, such for example as "agriculture," which, as used by lexicographers has alternate meanings, one broader than the other, what is described in *Rochester Telephone Corporation* v. *United States,* 307 U. S. 125 [59 S. Ct. 754, 83 L. Ed. 1147], as the "doctrine of administrative finality" might justify treating as conclusive the adoption by such agency of the narrower rather than the broader meaning, as for example by excluding from its use of the word "agriculture" the mere cultivation for purposes of enjoyment of shrubs or flowers. But such conclusiveness must stop short of an interpretation purporting to restrict the term to be defined beyond all limits known to recognized usage.

We may further add that our attention has been called to the case of *Unemployment Reserves Commission* v. *St. Francis Home Association,* (unreported) decided on April first of this year by the Appellate Department of the Superior Court of the City and County of San Francisco. That case seems to us distinguishable from the present one. The association there involved was a non-profit corporation composed of the land owners of a residential tract who by the purchase of property became members of the association. Its purpose was to cultivate and care for grass, flowers, trees and shrubs on the lots owned by the association and on the curb strips fronting on the properties of the members. The association was maintained by the assessment of the property owners and constantly employed seven gardeners. The commission contended that it was liable under the Unemployment Insurance Act for the tax imposed on its payroll. It claimed exemption under sections 7a and 7b respectively covering agricultural labor and domestic service in a private home. Specifically the association claimed that because, in its broader sense the term agriculture includes horticulture and its employees were, among other things, engaged in cultivating the ground, their activities were included within the exemption of "agricultural labor." The court held that the essential purpose of the association was to enhance the attractiveness of the residential tract, to beautify its parks and curb

strips and that even though the association's employees were engaged in horticultural work they were not agricultural laborers nor were their wages exempt from taxation as coming within the exemption of domestic service about private homes. It was the court's view that, although agricultural labor in some instances includes horticulture, this must, to be so included, be practiced in cultivating the ground or raising or harvesting crops on a farm. Farms would include ranches devoted to orchards, vineyards, fruit-raising, truck-farming, dairying and the raising of stock and poultry. It is apparent that the activities of the association did not amount to farming and were therein widely different from the operations of the defendant in the case at bar.

We find no error in the determination of the municipal court and its judgment is therefore affirmed.